# UNITED STATES DISTRICT COURT

for the

Central District of California

| | |
|---|---|
| In the Matter of the Search of<br>*(Briefly describe the property to be searched or identify the person by name and address)*<br><br>2.75'' by 5.75," black Motorola Moto E5 go Verizon touch screen cellular telephone, with the label "Motorola" | )<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

Case No. 20-MJ-1697

## APPLICATION FOR A WARRANT BY TELEPHONE OR OTHER RELIABLE ELECTRONIC MEANS

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location):*

    *See Attachment A2*

located in the Central District of California, there is now concealed *(identify the person or describe the property to be seized)*:

    *See Attachment B2*

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

    ☒ evidence of a crime;

    ☒ contraband, fruits of crime, or other items illegally possessed;

    ☒ property designed for use, intended for use, or used in committing a crime;

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 21 U.S.C. §§ 846 and 841 | Conspiracy to Distribute and Possess with Intent to distribute marijuana/ Manufacturing  marijuana |
| 43 C.F.R. § 2920.1-2 (e) | Using public lands other than for casual use |
| 43 C.F.R § 3809.605(a) | Undue degradation of public lands managed by BLM |

The application is based on these facts:

    *See attached Affidavit*

    ☒ Continued on the attached sheet.

    ☐ Delayed notice of_____days *(give exact ending date if more than 30 days*:_____) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

_____
*Applicant's  signature*

Bureau of Land Management Law Enforcement Ranger Ricky Abitu, Jr.
*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by telephone.

Date:   April 16, 2020_____

_____
*Judge's  signature*

City and state: Los Angeles, CA_____

Honorable Michael Wilner
*Printed name and title*

AUSA: GREGORY A. LESSER

## ATTACHMENT A-2

SUBJECT DEVICE 1 TO BE SEARCHED:

Seized from Marcus Leon-Tapia on April 15, 2020 and presently in the custody of BLM officers: an approximately 2.75'' by 5.75," black Motorola Moto E5 go Verizon touch screen cellular telephone, with the label "Motorola" imprinted on the bottom of the screen. The cell phone has multiple scratches on the screen.  There is small gash on the bottom of the phone, located on the left side of the charging port.

**ATTACHMENT B-2**

ITEMS TO BE SEIZED

      I.      ITEMS TO BE SEIZED

      1.      The items to be seized are evidence, contraband, fruits, or instrumentalities of violations of (1) conspiracy to manufacture, distribute and possess with intent to distribute marijuana, a schedule I controlled substance, in violation of 21 U.S.C. §§ 846 and 841, and manufacturing marijuana in violation of 21 U.S.C. § 841; (2) using, occupying, or developing the public lands, other than for casual use, in violation 43 C.F.R. § 2920. 1-2 (e); and (3) causing any unnecessary or undue degradation of public lands surfaces managed by BLM in violation of 43 C.F.R § 3809.605(a) (the "Subject Offenses"), including:

      a.      lists of customers and related identifying information;

      b.      types, amounts, and prices of drugs trafficked, as well as dates, places, and amounts of specific transactions;

      c.      types, amounts and prices of firearms transferred or acquired, as well as dates, places and amounts of specific transactions;

      d.      any information related to sources of drugs (including names, addresses, phone numbers or other identifying information);

      e.      any information related to the source of firearms (including names, addresses, phone numbers or other identifying information);

      f.      any information recording the above-listed individuals' schedule or travel from 2020 to present;

      g.      all bank records, checks, credit card bills, account information, or other financial records;

      h.     evidence of user attribution showing who used or owned the cellular telephones and digital devices at the time the things described in this warrant were created, edited, or deleted, such as logs, phone books, saved usernames and passwords, documents, and browsing history;

      i.     in addition, permitting the search of the memory of such devices for:

      (1)     all telephone numbers and direct connect numbers or identities assigned to the device, including Electronic Serial Number (ESN) and the International Mobile Subscriber Identity Number (IMSI) related to the cellular telephones;

      (2)     call and direct connect history information, including dates, times, and duration of telephone calls, as well as the contact information related to those calls;

      (3)     telephone book or list of contacts;

      (4)     photographs, video footage, text messages, and emails evidencing marijuana or controlled substance distribution

      (5)     text messages relating to drug transactions or the acquisition or illegal transfer or possession of firearms, payment for such transactions, or arrangements to meet for such transactions;

      (6)     email messages relating to drug trafficking, payment for such transactions, or arrangements to meet for such transactions;

      (7)     email messages relating to the acquisition or illegal transfer or possession of firearms, payment for such transactions, or arrangements to meet for such transactions;

      (8)     photographs and/or videos, in particular photographs and/or videos of co-conspirators, assets, and/or controlled substances;

(9)      access to social media available on the cellular telephones and digital devices to search for the items listed in this attachment

2.      The SUBJECT DEVICE which is itself or which contains evidence, contraband, fruits, or instrumentalities of the Subject Offenses, and forensic copies thereof.

3.      With respect to any SUBJECT DEVICE containing evidence falling within the scope of the foregoing categories of items to be seized:

a.      evidence of who used, owned, or controlled the device at the time the things described in this warrant were created, edited, or deleted, such as logs, registry entries, configuration files, saved usernames and passwords, documents, browsing history, user profiles, e-mail, e-mail contacts, chat and instant messaging logs, photographs, and correspondence;

b.      evidence of the presence or absence of software that would allow others to control the device, such as viruses, Trojan horses, and other forms of malicious software, as well as evidence of the presence or absence of security software designed to detect malicious software;

c.      evidence of the attachment of other devices;

d.      evidence of counter-forensic programs (and associated data) that are designed to eliminate data from the device;

e.      evidence of the times the device was used;

f.      passwords, encryption keys, and other access devices that may be necessary to access the device;

g.      applications, utility programs, compilers, interpreters, or other software, as well as documentation and manuals, that may be necessary to access the device or to conduct a forensic examination of it;

h.      records of or information about Internet Protocol addresses used by the device;

i.      records of or information about the device's Internet activity, including firewall logs, caches, browser history and cookies, "bookmarked" or "favorite" web pages, search terms that the user entered into any Internet search engine, and records of user-typed web addresses.

4.      As used herein, the terms "records," "documents," "programs," "applications," and "materials" include records, documents, programs, applications, and materials created, modified, or stored in any form, including in digital form on any digital device and any forensic copies thereof.

## II.      SEARCH PROCEDURE FOR THE SUBJECT DEVICE

5.      In searching the SUBJECT DEVICE(S) (or forensic copies thereof), law enforcement personnel executing this search warrant will employ the following procedure:

a.      Law enforcement personnel or other individuals assisting law enforcement personnel (the "search team") may search any SUBJECT DEVICE capable of being used to facilitate the above-listed violations or containing data falling within the scope of the items to be seized.

b.      The search team will, in its discretion, either search each SUBJECT DEVICE where it is currently located or transport it to an appropriate law enforcement laboratory or similar facility to be searched at that location.

c.      The search team shall complete the search of the SUBJECT DEVICE(S) as soon as is practicable but not to exceed 120 days from the date of issuance of the warrant. The government will not search the digital device(s) beyond this 120-day period without obtaining an extension of time order from the Court.

d.      The search team will conduct the search only by using search protocols specifically chosen to identify only the specific items to be seized under this warrant.

i.       The search team may subject all of the data contained in each SUBJECT DEVICE capable of containing any of the items to be seized to the search protocols to determine whether the SUBJECT DEVICE and any data thereon falls within the scope of the items to be seized. The search team may also search for and attempt to recover deleted, "hidden," or encrypted data to determine, pursuant to the search protocols, whether the data falls within the scope of the items to be seized.

ii.       The search team may use tools to exclude normal operating system files and standard third-party software that do not need to be searched.

iii.       The search team may use forensic examination and searching tools, such as "EnCase" and "FTK" (Forensic Tool Kit), which tools may use hashing and other sophisticated techniques.

e.       If the search team, while searching a SUBJECT DEVICE, encounters immediately apparent contraband or other evidence of a crime outside the scope of the items to be seized, the team shall immediately discontinue its search of that SUBJECT DEVICE pending further order of the Court and shall make and retain notes detailing how the contraband or other evidence of a crime was encountered, including how it was immediately apparent contraband or evidence of a crime.

f.       If the search determines that a SUBJECT DEVICE does not contain any data falling within the list of items to be seized, the government will, as soon as is practicable, return the SUBJECT DEVICE and delete or destroy all forensic copies thereof.

g.       If the search determines that a SUBJECT DEVICE does contain data falling within the list of items to be seized, the government may make and retain copies of such data, and may access such data at any time.

h.      If the search determines that the SUBJECT DEVICE is (1) itself an item to be seized and/or (2) contains data falling within the list of other items to be seized, the government may retain the digital device and any forensic copies of the digital device, but may not access data falling outside the scope of the other items to be seized (after the time for searching the device has expired) absent further court order.

i.      The government may also retain a SUBJECT DEVICE if the government, prior to the end of the search period, obtains an order from the Court authorizing retention of the device (or while an application for such an order is pending), including in circumstances where the government has not been able to fully search a device because the device or files contained therein is/are encrypted.

j.      After the completion of the search of the SUBJECT DEVICE(S), the government shall not access digital data falling outside the scope of the items to be seized absent further order of the Court.

4.      The review of the electronic data obtained pursuant to this warrant may be conducted by any government personnel assisting in the investigation, who may include, in addition to law enforcement officers and agents, attorneys for the government, attorney support staff, and technical experts.  Pursuant to this warrant, the investigating agency may deliver a complete copy of the seized or copied electronic data to the custody and control of attorneys for the government and their support staff for their independent review.

6.      The special procedures relating to digital devices found in this warrant govern only the search of digital devices pursuant to the authority conferred by this warrant and do not apply to any search of digital devices pursuant to any other court order.

## AFFIDAVIT

I, Ricky Abitu, Jr., being duly sworn, declare and state as follows:

### I.  INTRODUCTION

1.       I am Law Enforcement Ranger with the Bureau of Land Management ("BLM"), an agency of the Department of the Interior, and have been so employed since May 2017. Currently, I am assigned to the Barstow Field Office, in Barstow, California. Prior to my employment as a Law Enforcement Ranger, I served as a uniformed Department of Defense ("DOD") Law Enforcement Officer for the Marine Corps Logistics Base (Barstow) from November 2010 until May 2017. I currently serve in the United States Army Reserves as a Military Police Officer. I am a graduate of the Federal Law Enforcement Training Center in Glynco, Georgia. As part of the training, I attended criminal investigation training which included course studies in criminal law, constitutional law, and federal court procedures.

### II.  PURPOSE OF AFFIDAVIT

2.       This affidavit is made in support of an application for a warrant to search an outdoor marijuana grow facility located on BLM land and four cellular devices that were seized from individuals associated with the grow facility who were arrested then cited and released on April 15, 2020.

3.       BLM seeks to search the outdoor marijuana grow and four cellular devices for evidence of a crime, contraband, fruits of a crime, or other items illegally possessed, and/or property designed for use, intended for use, or used in committing a crime, namely: (1) conspiracy to manufacture, distribute and possess with intent to distribute marijuana, a schedule I controlled substance, in violation of 21 U.S.C. §§ 846 and 841, and manufacturing marijuana in violation of 21 U.S.C. § 841; (2) using, occupying, or developing the public lands, other than for casual use, in violation 43 C.F.R. § 2920. 1-2 (e); and (3) causing any unnecessary or undue degradation of public lands surfaces managed by BLM in violation of 43 C.F.R § 3809.605(a) (collectively, the "Subject Offenses").

4.      The facts set forth in this affidavit are based upon my personal observations, my training and experience, and information obtained from various law enforcement personnel and witnesses.  This affidavit is intended to show merely that there is sufficient probable cause for the requested warrant and does not purport to set forth all of my knowledge of or investigation into this matter.  Unless specifically indicated otherwise, all conversations and statements described in this affidavit are related in substance and in part only.

### III.   PREMISES AND DIGITAL DEVICES TO BE SEARCHED

5.      The premises and digital devices to be searched are described as follows:

a.      An outdoor marijuana "grow" facility identified as follows: the grow site is located approximately .29 miles northeast of the intersection of Stoddard Wells Road and Slash X Ranch Road in the County of San Bernardino, California, contained within the following GPS coordinates, denoted by its corners: Southeast corner N 34.64891 by W 117.15806, Southwest corner N34.64889 by W117.15848, Northwest corner N34.64926 by W 117.15849, Northeast corner N34.64925 by W117.15808.  The grow site is contained within approximately .41 acres of land owned by United States Government and administered by the BLM's Barstow Field Office. It is located within area known as the Stoddard Valley Off-Highway Vehicle area, and it is fenced in by 4-foot high wire fencing.  The grow location contains three greenhouses approximately 100 feet long by 20 feet wide covered with white opaque and black plastic coverings supported by a wood  structure, with an approximately 10 foot by 10 foot living quarters made of black plastic covering supported by wood structures located in the northwest corner of the grow facility.  The grow location is also described in Attachment A-1, which is incorporated herein.  Hereinafter it is also termed the "Subject Premises."  A photograph of the location and a map showing its location on BLM land are also attached to this Affidavit as Exhibit 1.

b.      Seized from Marcus Leon-Tapia on April 15, 2020 and presently in the custody of BLM officers: an approximately 2.75'' by 5.75," black Motorola Moto E5 go Verizon touch screen cellular telephone, with the label "Motorola" imprinted on the bottom of the screen. The cell phone has multiple scratches on the screen. There is small gash on the bottom of the phone, located on the left side of the charging port. This digital device is also described in Attachment A-2, which is incorporated herein. Hereinafter it is also termed "Subject Device 1."

c.       Seized from Santos Villa-Mesa on April 15, 2020 and presently in the custody of BLM officers: a black and silver iPhone 6(S) touch screen cellular telephone, Model A1688, FCC ID: BCG-E2946A, IC 579C-E2946A, in a black and brown "Saint Jude" cell phone case. This digital device is also described in Attachment A-3, which is incorporated herein. Hereinafter it is also termed "Subject Device 2."

d.      Seized from Santos Villa-Mesa on April 15, 2020 and presently in the custody of BLM officers: a blue Kyocera Verizon "flip" cellular telephone, Model: S2720PP, SKU: KYOS2720PP, IMEI: 015247001964659. This digital device is also described in Attachment A-4, which is incorporated herein. Hereinafter it is also termed "Subject Device 3."

e.      Seized from Juan Madrigal-Guillen on April 15, 2020 and presently in the custody of BLM officers: a black and silver iPhone 6 (S) Plus, Model: A1634, FICC ID: BCG-E2944A, IC:579C-E2944A, with a cracked screen protector. This digital device is also described in Attachment A-5, which is incorporated herein. Hereinafter it is also termed "Subject Device 4."

## IV.  STATEMENT OF PROBABLE CAUSE

### A.    Summary of Probable Cause

6.      Since late March, 2020, I and other BLM law enforcement personnel have been aware of an illegal outdoor marijuana grow on BLM land at the Subject Premises. We have

since monitored the illegal grow operation in an effort to identify the suspects responsible for conducting the illegal operation.  On April 15, 2020, there was overt contact between the suspects and myself and other BLM law enforcement personnel.  Three suspects believed to be associated with the illegal grow operation were detained, searched incident to their arrests, and questioned.  Four cellular digital devices were seized from the three suspects at that time.  The suspects were cited for various violations of federal laws and regulations and released.  The illegal grow location and the four seized devices have been secured pending the issuance of the warrant requested by this Affidavit.  I now seek a warrant to search the illegal marijuana grow location (which contains an apparent temporary residence) and the four seized digital devices.

**B.     Detail of Probable Cause**

       1.     <u>Discovery of the Marijuana Grown at the Subject Premises and Confirmation it was on BLM Land</u>

7.     On March 26, 2020, at approximately 1200 hours, I was notified by an individual of a possible marijuana grow site in the area known as "Crash Corners," in Stoddard Valley, in San Bernardino County, within the Central District of California.  The reporting party informed me that, on March 24, 2020, while recreating with his family, he observed what appeared to be large garden covered with a white tarp.  The garden was located at the base of a mountain, located in the area of Crash Corners Off-Highway Vehicle ("OHV") Recreation Area.  I know from my training and experience that the area commonly known as Crash Corners, in Stoddard Valley, is an open OHV recreation area open to the public.  Individuals often come to the area to engage in various activities such as OHV use, dirt biking, camping, and hiking.  The area is comprised of desert landscape, vegetation and wildlife.

8.     On March 26, 2020, at approximately 1420 hours, BLM Supervisory Ranger Thomas Friend and I drove to the site of the Subject Premises and confirmed that it was located on BLM Public Lands.  I could observe three larger structures, estimated to be approximately 100 feet in length by approximately 20 feet in width, covered in white and black tarps.  There was also a smaller structure also enclosed in the fenced-off area of an approximate size of ten by

ten feet, which appears to be a temporary residence.   The structures were fenced off from the surrounding area with wire mesh.  Ranger Friend and I proceeded to walk around the perimeter of the fence line.  Upon walking on the west side of the site, I could observe in plain view, from outside the fence, numerous green leafy plants planted in black containers inside the structures. Based on my training and experience, I recognized these plants to be marijuana plants.  I also recognized the strong odor of marijuana emanating from the structures.  I began taking pictures from outside the fence line, of all three structures.  Ranger Friend obtained Global Positioning Satellite ("GPS") coordinates using his government-issued smartphone, to document the location of the exterior fence line's northeast corner at approximately N 34.64922, W 117.15809.

9.      In response to my query, on March 31, 2020, BLM Geographic Information Systems ("GIS") staff confirmed that the Subject Premises is on BLM Public Lands.  Utilizing the coordinates provided by Ranger Friend, the Subject Premises is located on Township 7 North, Range 3 West, Section 35, located in San Bernardino County, California.

10.      On March 27, 2020, BLM Special Agent ("SA") Apley and I placed two hidden motion-activated surveillance cameras in the area of the Subject Premises in order to detect possible participants in the illegal marijuana grow operation.  On April 2, 2020, I reviewed photographs taken from the hidden cameras and noted in them a Nissan Xterra, California license plate no. 4MOE357, towing water tanks and driving toward and later parked at the Subject Premises.  Based upon my training and experience, I know that there is no running water in the area of the Subject Premises and that marijuana plants require water to grow, and given the remote location of the Subject Premises, I concluded that the driver of the Xterra was delivering water to the Subject Premises.

2.      Contact with Suspects Associated with the Subject Premises Illegal Grow

11.      On April 15, 2020, at approximately 1230 hours, SA Apley and I conducted surveillance of the Subject Premises, which at first appeared to be unoccupied.  Then while conducting surveillance, Agent Apley and I came into contact with a Hispanic male with black hair and brown eyes, wearing camouflage pants and black shirt, who stated his name was

"Mark."  ("Mark" was later identified by his California driver's license as Marcus Leon-Tapia, hereinafter "Tapia.")  We were operating in an undercover capacity and did not identify ourselves as law enforcement officers.  When asked what he was growing in his green houses, Tapia stated that he was growing tomatoes.  Tapia further stated that he sells his tomatoes at the Victoria Gardens Farmers Market.  When asked where he was living, Tapia stated that he was living in the site.  When asked who owned the property, Tapia stated that his buddy owned the property.  When asked for Tapia's "buddy's" name, Tapia stated "Naw, I don't know."  SA Apley and I then departed the area and moved to a location along the road to the Subject Premises approximately two miles away.

12.     While leaving the area of the Subject Premises, Agent Apley asked BLM Law Enforcement Ranger N. Benavidez to take a position on a hilltop located approximately ¼ of mile west of the grow site to conduct surveillance while Agent Apley and Ranger Abitu went back down Stoddard Valley Road away from the Subject Premises to prepare a search warrant affidavit.  SA Apley asked Ranger Benavidez and to keep in contact with Ranger Benavidez to see if subject Tapia tried to leave the grow site.  A short time later Ranger Benavidez called out on the radio that the subject was packing a backpack.  SA Apley instructed Ranger Benavidez to detain Tapia, which Ranger Benavidez did.  Tapia was later attempted to be interviewed, but after being advised of his *Miranda* rights, he invoked his right to speak with an attorney.  Tapia's cellular telephone (Subject Device 1) was seized as evidence incident to his arrest, and he was detained pending being cited and released.  During the time he was detained, Tapia spontaneously (after twice being reminded that he had invoked his right to speak with an attorney before questioning) claimed that the grow was permitted, and referred to subject Villa-Mesa (discussed below) as his "partner."  Tapia was cited with a Central Violations Bureau ("CVB") citation and released.

13.     At approximately the same time that SA Apley and I were approximately two miles away from the Subject Premises preparing to draft a search warrant affidavit and instructing Ranger Benavidez to detain Tapia, BLM Supervisory Ranger T. Friend was at our

location.  An older, black 2011 Ford, Explorer passed our location on Stoddard Valley Road.
The driver was a younger Hispanic male.  Based on my training and experience, and given the
timing of this vehicle proceeding to the remote location of the Subject Premises and Tapia's
packing a backpack, I believed the driver of the vehicle was likely coming to pick up Tapia.
Ranger Friend followed the driver, later identified by his California Driver's License as Santos
Villa-Mesa ("Mesa"), who drove to within 1/3 of a mile of the Subject Premises.  Ranger
Benavidez conducted a traffic stop on the vehicle.  Ranger Benavidez could smell marijuana as
he approached the vehicle, and could see marijuana "blunts" (cigar shells that are typically
packed with and then used for smoking marijuana) in the front passenger seat.  Mesa consented
to a search of himself and his vehicle, and a personal use amount of methamphetamine was
located in Mesa's pocket.  Mesa was detained and later was advised of his *Miranda* rights and
interviewed in Spanish by Ranger Benavidez, a fluent Spanish speaker.  Mesa at first stated that
he was just dropping off marijuana joints to the Subject Premises and did not know Tapia.  He
was admonished that intentionally lying to a federal officer was a federal felony and he then
admitted (among other things) that Tapia was his partner, that he helped Tapia tend the
greenhouses and that when the marijuana plants were harvested, they were taken to a house and
chopped up to make Hashish.  Mesa's two cellular phones (Subject Devices 2 and 3) were seized
as evidence pending the issuance of the warrant sought herein.  Mesa was cited with a CVB
citation and released.

14.     At approximately 1730 hours, another vehicle approached the remote location of
the Subject Premises, closing to approximately 50 feet before the driver stopped the vehicle and
attempted to drive out into the rough desert and conduct a U-turn outside of the road.  The
vehicle was recognized as the same Nissan Xterra bearing California license plate no. 4MOE357,
towing water tanks, which had previously been seen in surveillance photographs apparently
delivering water to the Subject Premises.  The driver was not successful in attempting the U-turn
into the desert with the trailer before BLM officers stopped and detained him.  He was identified
by his Mexican voter identification card issued by the Mexican Consulate in San Bernardino,

California, as Juan Madrigal Guillen ("Guillen").  He was interviewed in Spanish by Ranger Benavidez, and after being advised of his rights pursuant to *Miranda*, stated among other things that he was taking the water to fill the tanks at the greenhouses on the Subject Premises, and claimed that the area is permitted for growing marijuana.  Guillen's cellular phone (Subject Device 4) was seized as evidence pending the issuance of the warrant sought herein.  Guillen was cited with a CVB citation and released.

15.     The area of the Subject Premises is on federal land administered by the BLM and is not permitted for growing marijuana.  The Subject Premises has been secured pending the issuance of the search warrant sought by this affidavit.

**C.     Training and Experience on Outdoor Marijuana Grows**

16.     In 2019, I was assigned with Campaign Against Marijuana Planting ("C.A.M.P."), a program managed by the California Department of Justice.  Throughout the course my duties, I have become familiar with the methods and techniques utilized in outdoor marijuana grow operations and the unique trafficking patterns employed by drug trafficking organizations.  From my training and experience, through discussions with experienced narcotics investigators and through the information I have learned through personal participation in other investigations, I know that most outdoor marijuana cultivation operations are generally established and conducted in a similar manner, in particular as follows:

a.  Outdoor marijuana cultivation organizations start exploring and scouting potential cultivation sites in the late winter and early spring.  Most outdoor marijuana cultivation organizations desire to plant marijuana plants as early as possible in order to harvest the plants as early as possible and potentially tend a second crop for the year before it becomes too cold for growing in the late fall and early winter.

b.  In many cases, fertilizers, herbicides, pesticides and irrigation equipment are acquired from various vendors, as well as through illegal sources, such as through smuggled items brought into the United States.  As equipment and supplies for the marijuana grow site are

procured, the outdoor marijuana cultivation organization starts to deliver items to the area of the marijuana cultivation site. The land is prepared for planting and watering of the marijuana plants.

c.  The natural vegetation is cut, removed or thinned to make space for the marijuana plants.  After the land has been prepared for planting, the marijuana seeds or plants are placed into the ground.  As the marijuana plants mature, more workers arrive at the cultivation site(s) to help with the labor involved in harvesting and processing of the marijuana buds.

d.  The harvested marijuana is laid out to dry in processing areas within the cultivation site(s) and as it becomes dried, it is packaged and moved to the drop point for pick up by the drivers for delivery to the distribution centers or to the organization's leadership.  Upon completion of harvesting the marijuana plants, the sites are abandoned, leaving behind materials such as pesticides, herbicides, fertilizers, trash, propane tanks and food items.  The by-products of marijuana cultivation have the capability of harming the environment and wildlife and contaminating nearby water sources, such as creeks and streams.

e.  It is common for individuals to live on site to tend to the plants.  Make-shift housing is usually established, including but not limited to tents, campers, and trailers.  In addition to housing, these structures are also commonly used for processing and storing marijuana, storing food and other supplies, including but not limited to fertilizer caches, pesticides, camping equipment, and items necessary for the cultivation, packaging and distribution of marijuana, and marijuana proceeds.

f.  It is also common to find in the marijuana grow and associated structures personal items, such as combs, cigarette butts, toothbrushes, clothing, duffel bags, and weapons. I know that crime laboratories may be able to recover DNA samples and other forensic evidence from these items for possible identification of subjects involved in the illicit grow.

g.  It is common for individuals at the grow site(s) to possess weapons, such as firearms, knives and other items.  These weapons are possessed for personal protection and to protect the marijuana grow site(s).

h.  Marijuana cultivation organizations are dependent on the use cellular telephones and other digital devices to facilitate communications in furtherance of the illicit scheme.  I know that cellular telephones and other digital devices are used to communicate among co-conspirators, distributors, purchasers, drivers, laborers in the grow site(s) and leaders of the organization.  Further, I know that cell phones and other communication facilities are often used to negotiate times, places, schemes and manners for importing, possessing, concealing, manufacturing and distributing controlled substances and for arranging the disposition of proceeds from the sales of controlled substances.  Based on training, experience and conversations with other officers, I know that some cultivation sites are in areas where there is no cellular phone service.  In these situations, a designated check-in time is established, in which laborers walk to an area where there is cellular service to make calls and use other digital/electronic devices.

### D.    Training and Experience on Digital Devices

17.    As used herein, the term "digital device" includes Subject Devices 1-4.

18.    Based on my training, experience, and information from those involved in the forensic examination of digital devices, I know that the following electronic evidence, inter alia, is often retrievable from digital devices:

a.    Forensic methods may uncover electronic files or remnants of such files months or even years after the files have been downloaded, deleted, or viewed via the Internet. Normally, when a person deletes a file on a computer, the data contained in the file does not disappear; rather, the data remain on the hard drive until overwritten by new data, which may

only occur after a long period of time.  Similarly, files viewed on the Internet are often automatically downloaded into a temporary directory or cache that are only overwritten as they are replaced with more recently downloaded or viewed content and may also be recoverable months or years later.

b.      Digital devices often contain electronic evidence related to a crime, the device's user, or the existence of evidence in other locations, such as, how the device has been used, what it has been used for, who has used it, and who has been responsible for creating or maintaining records, documents, programs, applications, and materials on the device.  That evidence is often stored in logs and other artifacts that are not kept in places where the user stores files, and in places where the user may be unaware of them.  For example, recoverable data can include evidence of deleted or edited files; recently used tasks and processes; online nicknames and passwords in the form of configuration data stored by browser, e-mail, and chat programs; attachment of other devices; times the device was in use; and file creation dates and sequence.

c.      The absence of data on a digital device may be evidence of how the device was used, what it was used for, and who used it.  For example, showing the absence of certain software on a device may be necessary to rebut a claim that the device was being controlled remotely by such software.

d.      Digital device users can also attempt to conceal data by using encryption, steganography, or by using misleading filenames and extensions.  Digital devices may also contain "booby traps" that destroy or alter data if certain procedures are not scrupulously followed.  Law enforcement continuously develops and acquires new methods of decryption, even for devices or data that cannot currently be decrypted.

19.     Based on my training, experience, and information from those involved in the forensic examination of digital devices, I know that it is not always possible to search devices for data during a search of the premises for a number of reasons, including the following:

        a.     Digital data are particularly vulnerable to inadvertent or intentional modification or destruction.  Thus, often a controlled environment with specially trained personnel may be necessary to maintain the integrity of and to conduct a complete and accurate analysis of data on digital devices, which may take substantial time, particularly as to the categories of electronic evidence referenced above.

        b.     Digital devices capable of storing multiple gigabytes are now commonplace.  As an example of the amount of data this equates to, one gigabyte can store close to 19,000 average file size (300kb) Word documents, or 614 photos with an average size of 1.5MB.

20.     Other than what has been described herein, to my knowledge, the United States has not attempted to obtain this data by other means.

## V.    ITEMS TO BE SEIZED

21.     Based on the foregoing, I respectfully submit that there is probable cause to believe that the items listed in Attachments B1-5, which are incorporated herein, which constitute evidence of violations of the Subject Offenses, will be found at the Subject Premises and in the Subject Devices.

## VI.    CONCLUSION

22.     For all the reasons described above, there is probable cause to believe that evidence of violations of (1) conspiracy to manufacture, distribute and possess with intent to distribute marijuana, a schedule I controlled substance, in violation of 21 U.S.C. §§ 846 and 841, and manufacturing marijuana in violation of 21 U.S.C. § 841; (2) using, occupying, or developing the public lands, other than for casual use, in violation 43 C.F.R. § 2920. 1-2 (e); and

(3) causing any unnecessary or undue degradation of public lands surfaces managed by BLM in violation of 43 C.F.R § 3809.605(a), as described above and in Attachment B of this affidavit, will be found in a search of the Subject Premises and Subject Devices, as further described above and in Attachments A-1 to A-5 of this affidavit.

_____

Ricky Abitu, Jr., Law Enforcement Ranger
Bureau of Land Management

Subscribed to and sworn via telephone before me
this _____ day of April, 2020.


_____
HONORABLE MICHAEL R. WILNER
UNITED STATES MAGISTRATE JUDGE

# EXHIBIT 1



**Township 7 North, Range 3 West, Section 35**



**Township 7 North, Range 3 West, Section 35 (Land Status)**